283 F.2d 180
 Clifford Norman McLEOD, Appellant,
v.
Cecil PETERSON, Acting Officer in Charge of United States Department of Justice, Immigration and Naturalization Service, 714 New Federal Building, Pittsburgh, Pa.
 No. 13184.
 United States Court of Appeals Third Circuit.
 Argued June 10, 1960.
 Decided October 6, 1960.
 As Amended November 17, 1960.
 
 COPYRIGHT MATERIAL OMITTED Robert L. Prior, Pittsburgh, Pa., for appellant.
 John F. Potter, Asst. U. S. Atty., Pittsburgh, Pa. (Hubert I. Teitelbaum, U. S. Atty., W. D. of Pennsylvania, Pittsburgh, on the brief), for appellee.
 Before BIGGS, Chief Judge, and KALODNER and FORMAN, Circuit Judges.
 BIGGS, Chief Judge.
 
 
 1
 This is an appeal from an order denying an application for a writ of habeas corpus brought to review an order of deportation and the denial of an application for suspension of deportation. Briefly, the facts are these. The appellant, McLeod, a native of Jamaica, B.W.I., first illegally entered the United States in 1926 or 1927. He was deported in 1941, but returned illegally in 1942, and in 1943 married an American citizen. A daughter was born of this marriage in Pittsburgh, Pennsylvania, on February 6, 1953. The child, now seven years old, is of course, a citizen of the United States. In 1956 deportation proceedings were instituted against McLeod at which time he applied for suspension of deportation, or in the alternative, for the right of voluntary departure. The Special Inquiry Officer denied his application for suspension of deportation in order, apparently, to preserve one number in the small immigration quota available to persons of McLeod's nationality. The appellant then agreed to an order of voluntary departure upon assurances given by the Officer and Counsel representing the Immigration and Naturalization Service that, if he did so, the Service would aid his wife in making the necessary application presumably under 8 U.S.C.A. § 1155, "nonquota status", for his legal re-entry, and would assist the appellant to return to this country. Mrs. McLeod was at that time fatally ill, and the record is devoid of any application made by her, and the appellant does not assert that such an application was executed or filed. No appeal was taken from the ruling of the Special Inquiry Officer or from the order of voluntary departure.
 
 
 2
 Pursuant to this order the appellant crossed from this country into Canada on August 13, 1956. Two days later he made application to the United States Consulate in Toronto, Canada, for a visa to re-enter the United States. No visa was forthcoming and on learning that his wife was seriously ill and almost destitute appellant illegally returned to the United States for a period of eleven days in April, 1957. By September, 1957 his wife was critically ill. In that month appellant again re-entered this country illegally, and on December 16, 1957 Mrs. McLeod died. Since that time, McLeod, a minister, has been supporting his minor child. In 1958 the immigration authorities arrested him pursuant to a warrant of deportation. In the ensuing proceedings appellant's request for an application for suspension of deportation was denied on the ground that he was not continuously physically present in the United States for five years as required by Section 1254(a) (2), 8 U.S.C.A. He was ordered deported. A petition for a writ of habeas corpus was denied by the court below and this appeal was taken.
 
 
 3
 McLeod contends, in effect, that the court below erred in holding that he was not physically present in the United States continuously for five years preceding his application as required by Section 1254(a) (2) of Title 8, U.S.C.A. It is not contended by the appellant that he was actually present during those years but rather that the nature of his absence was such as not to interrupt the continuity of his presence within the meaning of the statute. The appellant points to the ground on which he was declared to be ineligible for suspension of deportation by the Special Inquiry Officer in 1956 as erroneous and asserts that once faced by that ruling he had the alternative of either being deported or accepting an order for voluntary departure and that this choice was forced upon him by reason of the error of law committed in denying his application for suspension. Regarding his failure to appeal the denial of his application in 1956, McLeod argues that he was lulled into not pressing his legal rights by the assurances of the representatives of the Immigration Service.
 
 
 4
 The United States first contends that the appellant's failure to take an appeal from the 1956 proceeding renders it final and invulnerable to collateral attack. The assertion of this rather inflexible and technical rule as controlling here finds support in the Second Circuit's decision in United States ex rel. Koehler v. Corsi, 1932, 60 F.2d 123. In that decision an unappealed deportation order was held to be the law of the case.
 
 
 5
 The answer to the question whether prior unappealed deportation orders, orders of voluntary departure or decisions denying eligibility for discretionary suspension of deportation are subject to a later review depends upon the relative weights assigned to several conflicting interests. First, it must be recognized that there is a strong judicial and administrative interest in maintaining orderly and effective procedure. Second, there must be an end to litigation and thus, to uncertainty, so that officials and other persons may perform their duties and conduct their lives on the basis of reasonably firm principles and premises. There is also the interest of the individual litigant who finding himself faced with our complex and highly specialized judicial and administrative machinery is forced to entrust his rights, privileges and often his life and liberty, to counsel and a large corps of officials sometimes too hard pressed to afford his interests the protection they may ideally deserve.
 
 
 6
 The present case concerns eligibility to be considered for admission to permanent residence in the United States. In such a case, involving as it does the status of an alien, we are dealing with an especially critical and fundamental individual right. As the Supreme Court has pointed out "[W]e are dealing here with procedural requirements prescribed for the protection of the alien. Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. That deportation is a penalty — at times a most serious one — cannot be doubted. Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness." Bridges v. Wixon, 1945, 326 U.S. 135, 154, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103.
 
 
 7
 Where important rights are involved and their sacrifice is sought to advance considerations of efficient administration and public convenience the courts of our state and federal systems frequently have worked out compromise positions. Thus, where federal claims are denied on state procedural grounds the Supreme Court has indicated that a state refusal to adjudicate them must rest on a "fair or substantial basis". See Lawrence v. State Tax Commission, 1932, 286 U.S. 276, 282, 52 S.Ct. 556, 558, 76 L.Ed. 1102. Similarly, where the considerations militating against protection of important rights are those of maintaining a proper balance between our state and federal systems there is doctrine permitting flexibility of approach. For example, where the Supreme Court's jurisdiction to review state court decisions in cases involving federal claims is challenged on the ground that the denial of these claims is justified by the failure of the appellant to comply with state procedural rules, the Court will inquire into whether the procedural ground constitutes an unreasonable interference with the vindication of federal rights. See Mr. Justice Clark's summary of the law on this subject in his dissenting opinion in Williams v. State of Georgia, 1955, 349 U.S. 375, 399, 75 S.Ct. 814, 99 L.Ed. 1161.
 
 
 8
 An excellent example of how the courts have struck a balance between the basic competing considerations set out above is to be found in the development of the case law concerning Rule 51, Fed.Rules Civ.Proc., Title 28 U.S.C. That rule provides that "[N]o party may assign as error * * * the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict * * *." The language is absolute, but yet it is plain that if construed literally this rule could, on occasion, subject a litigant to gross injustice worked on him solely by the failure of his counsel and of the trial judge to properly perform their respective duties. Therefore, in keeping with current principles under analogous circumstances, a solution was reached which does not detract unduly from the Rule's role, permitting our judicial machinery to function smoothly. An appellate court can, on its own motion, review instructions where "fundamental error" has been committed. See, e. g. Callwood v. Callwood, 3 Cir., 1956, 233 F.2d 784; Mondshine v. Short, 5 Cir., 1952, 196 F.2d 606; Harlem Taxicab Ass'n v. Nemesh, 1951, 89 U.S.App.D.C. 123, 191 F.2d 459.
 
 
 9
 Courts, when faced with a request to review prior unappealed deportation orders, have also formulated a flexible approach as a safeguard against possible fundamental unfairness. In United States ex rel. Steffner v. Carmichael, 5 Cir., 1950, 183 F.2d 19, 20, the court, although holding that under the circumstances of that case an unappealed deportation order was not subject to review, said that: "Where an alien has been deported from the United States pursuant to a warrant of deportation, we do not think it permissible to allow a collateral attack on the previous deportation order in a subsequent * * * proceeding, unless we are convinced that there was a gross miscarriage of justice in the former proceedings." See also Daskaloff v. Zurbrick, 6 Cir., 1939, 103 F.2d 579. We perceive much merit in the Fifth Circuit's decision. It would seem that where it can be shown convincingly that fundamental errors have been committed in prior proceedings of the type here involved, and where a holding that the individual litigant was bound by the failures of his counsel or of the officials involved would result in a gross miscarriage of justice, such proceedings should be reopened and appropriate corrective measures taken. We hold that this test has been met in the present case.
 
 
 10
 McLeod's uncontradicted testimony reveals that the sole ground upon which his eligibility for discretionary relief was denied was that the granting of such relief would unduly diminish the small quota allotted to persons of his nationality. The Service, acting apparently with solicitude for McLeod's fellow nationals, decided that since he was eligible for admission pursuant to Section 1155, Title 8 U.S.C.A., which admission would not reduce the pertinent quota, it would be "unfair" of McLeod to succeed in his application for suspension of deportation. That this disposition was erroneous is perfectly clear. McLeod had requested that his application be submitted to the Attorney General in accordance with a specific provision of the Immigration and Nationality Act; viz., Section 1254(a) (2), Title 8 U.S.C.A. That section contains a statement of the conditions that must be met before the Attorney General may exercise his discretion. When these conditions are shown to have been met an applicant has a right to have his application considered. Jay v. Boyd, 1956, 351 U.S. 345, 353, 76 S.Ct. 919, 100 L.Ed. 1242; United States ex rel. Bruno v. Sweet, 8 Cir., 1956, 235 F.2d 801. It need hardly be pointed out that the conditions that McLeod failed to meet are nowhere to be found in Section 1254(a) (2). The effect on quota allotments by the admission of an alien to permanent residence may not be used by the Service to deny arbitrarily rights granted an alien under Section 1254 where he meets all of the requirements specified. The Service denied McLeod his rights under Section 1254 solely upon its speculation that he might leave the country and then be able to reenter with a nonquota status under Section 1155. Denial on such a basis does not lie within the discretion of the Attorney General.
 
 
 11
 This error was so obvious and so clear that counsel should have been quick to appeal. Nevertheless, no appeal was taken. We shall never know whether this omission was due in the main to the inadequacy of the appellant's knowledge of these situations or to the soothing statements made by officials of the Service.[1] We can be sure however, as the uncontradicted testimony of the appellant shows, that the statements of these officials, fraught as they were with suggestions of help from within the Bureau in getting back into this country and the mere formality of securing his return, played some role in causing McLeod to forego his legal rights. Indeed, as we have said, the error of law committed was fundamental and clear. Its commission evidenced a disregard of the applicable statutory provision and resulted in a disposition unsupported in logic or policy. Moreover, we are not called upon here to reverse an order or judgment rendered in a former proceeding but are required merely to examine an order to determine the effect it should have on determining the applicability of a statutory provision to one who acted pursuant to such an order. Under these circumstances we should not refuse to review the denial of eligibility for discretionary relief made in the 1956 proceeding and declare it to have been erroneous.
 
 
 12
 This in itself, however, does not entitle the appellant to have his application reviewed by the Attorney General. Such a right can only come from the statute and the applicable sections are not consistent with simple reinstatement of McLeod to the status he had acquired before his departure in 1956. Section 1254(a) (2) provides that in order to qualify for suspension of deportation an alien must have "* * * been physically present in the United States for a continuous period of not less than five years immediately preceding his application * * *." The time designated by the phrase `preceding his application' as used in the Section must be the time that the application is reviewed by the Attorney General. The phrase cannot refer merely to the time of filing an application. If this were not so an alien could apply for adjustment of status at a time when he met all the requirements of the statute and then leave the country and return without prejudice to his right to have his application considered by the Attorney General. Such a result would be anomalous. It follows then, that in the present case, and for present purposes, no "application" has as yet been made by the appellant within the meaning of Section 1254(a) (2). We, therefore, must consider all of the facts subsequent to the erroneous denial of his eligibility, as well as his prior status, in order to determine whether he is now eligible under this provision.
 
 
 13
 It is undisputed that McLeod was absent from the United States for approximately one year since the 1956 proceeding. Viewing this fact alone as determinative of McLeod's failure to meet the 5 year continuous physical presence test, the United States asserts that regardless of the 1956 proceeding he is now barred. Cases holding that even the briefest absence from this country disqualifies an alien under Section 1254(a) (2) are relied upon in making this assertion. See, e. g., United States ex rel. Bruno v. Sweet, D.C.W.D.Mo.1955, 133 F.Supp. 3, affirmed 8 Cir., 1956, 235 F.2d 801. This argument may be correct as far as it goes but we need not and do not decide here the length of the absence required to break the continuity of an alien's physical presence. Doubtless, a year's absence would be sufficient. However, here we are not concerned with whether the appellant was in fact absent but are presented with the question whether the circumstances of his departure were such as to cause a break in his "continuous" presence within the intendment of the statutory provision. While it is true that the statutory language does not admit of flexibility in this matter, on its face, it seems clear that circumstances can be suggested where an absence of even several years would not prevent an alien from being continuously physically present. For example, if McLeod, under color of law, had been seized and been held in Canada against his will for a period of time there would be little doubt that it was not the intent of Congress under such circumstances to render the statutory procedure unavailable.
 
 
 14
 A very helpful line of cases has developed construing Section 19(a) of the Immigration and Nationality Act of 1917, 39 Stat. 874, as amended 54 Stat. 671, 8 U.S.C.A. § 155(a) (Now Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1251(a) (4)). Under the provision cited it became necessary to determine whether and when an alien can be deemed to have made an "entry", for purposes of determining whether an alien had been convicted of a crime involving moral turpitude "after entry." The first cases dealing with this problem of construction flatly held that every return of an alien from a foreign country to the United States constituted an "entry" within the meaning of the Act. See, e. g., United States ex rel. Volpe v. Smith, 1933, 289 U.S. 422, 53 S.Ct. 665, 77 L.Ed. 1298. Nevertheless, in Delgadillo v. Carmichael, 1947, 332 U.S. 388, 68 S.Ct. 10, 92 L.Ed. 17, where an alien seaman entered a foreign country solely as a result of his ship being torpedoed, the Supreme Court held that his subsequent entry into the United States was not an entry within the meaning of Section 19(a). The Court said at page 391 of 332 U.S., at page 12 of 68 S.Ct.: "It would indeed be harsh to read the statute so as to add the peril of deportation to such perils of the sea," and the Court concluded by saying: "The stakes are indeed high and momentous for the alien who has acquired his residence here. We will not attribute to Congress a purpose to make his right to remain here dependent on circumstances so fortuitous and capricious as those upon which the Immigration Service has here seized. The hazards to which we are now asked to subject the alien are too irrational to square with the statutory scheme." Subsequently, where the circumstances of an alien's departure were fortuitous and a literal application of the statute would have been grossly unfair, this flexible approach was applied in order to most reasonably effectuate the purposes of the Act. Savoretti v. United States ex rel. Pincus, 5 Cir., 1954, 214 F.2d 314; Schoeps v. Carmichael, 9 Cir., 1949, 177 F.2d 391; Yukio Chai v. Bonham, 9 Cir., 1947, 165 F.2d 207. Cf. Barber v. Gonzales, 1954, 347 U.S. 637, 74 S.Ct. 822, 98 L.Ed. 1009. Similarly, in Petition of Barandiaran's Naturalization, D.C.S.D. N.Y.1954, 123 F.Supp. 827, on the authority of this line of decisions, an alien member of the armed forces' entry after a visit to Mexico authorized by his commanding officer was held not to be an "illegal entry" within the meaning of 8 U.S.C.A. § 1440a.
 
 
 15
 It would seem to be desirable to view Section 1254(a) (2), the provision here in question, as having inherent in it, sufficient flexibility to permit a rational effecting of the congressional intent. We must therefore consider whether the manner of McLeod's departure to Canada in 1956 was such as to be intended by Congress to interrupt his theretofore and subsequent continuous physical presence in this country.
 
 
 16
 It is clear that the appellant was deportable, and, therefore considered alone, there was no error with respect to the order of voluntary departure. But, we cannot consider that order in a vacuum. It was promulgated only after an erroneous deprivation of the appellant's right to discretionary relief. Had that right been granted, as it should have been, the appellant would have been entitled to a stay of deportation pending the Attorney General's disposition. Hatzistavrou v. Brownell, 1955, 96 U.S.App. D.C. 187, 225 F.2d 26. Thus, it is plain that absent the illegal action of the Immigration authorities, McLeod might not have lost the right that he now seeks. His 1956 status would have been preserved long enough for the Attorney General's discretionary review. Moreover, it was solely the error of the Service and the inadequacies of counsel that paved the way for McLeod's departure. These were its sole causes. Nevertheless, the Service, now scrupulously adhering to the language of Section 1254(a) (2), contends that its error in determining the appellant's status in 1956 and its order made possible only by virtue of that error, has now truly deprived the appellant of his status within the meaning of Section 1254(a) (2). To yield to this argument would be to become party to a "bootstrap" operation by means of which officers of the United States seek to turn their own error, however innocent, into a bar to the assertion of a right by the victim of this very error. We cannot hold that this is what the statute demands. Cf. United States ex rel. Accardi v. Shaughnessy, 1954, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681. Such a construction would presuppose an intention on the part of Congress to provide in the same section that grants a right, an illogical trap by which an alien could be deprived of that very right. On the contrary we hold that McLeod's 1956 departure did not interrupt his "continuous" presence within the meaning of the statute and that he, therefore, is eligible for discretionary relief with respect to his present application for suspension of deportation. We are construing here the meaning of the term "continuous" contained in a specific statute and we hold only that a departure from the United States such as that made by the appellant in 1956 under the circumstances at bar, does not interrupt the continuity of his presence in the United States within the meaning of that specific statutory provision.
 
 
 17
 One last point must be dealt with. One of the grounds for refusing the writ of habeas corpus below was that since McLeod is now out of custody on bond, the writ does not lie. This position is correct. Johnson v. Hoy, 1913, 227 U.S. 245, 33 S.Ct. 240, 57 L.Ed. 497; United States ex rel. Potts v. Rabb, 3 Cir., 1944, 141 F.2d 45. The proper procedure would have been to have filed a complaint in the court below requesting a temporary restraining order and a declaratory judgment asserting jurisdiction to review the proceedings pursuant to Section 10 of the Administrative Procedure Act. Shaughnessy v. Pedreiro, 1955, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868. However, the distinction between the two procedures in deportation cases seems now to be recognized as largely unsubstantial. Brownell v. Tom We Shung, 1956, 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed.2d 225. See also 71 Harv.L.Rev. 85, 187-89 (1957). Moreover the difference between the appellant being in custody and not being in custody would not affect the result in this case were the provisions of the Administrative Procedure Act applied under the circumstances at bar. Cf. Heikkila v. Barber, 1953, 345 U.S. 229, 236, 73 S.Ct. 603, 97 L.Ed. 972. In view of the foregoing and in view of the full hearing below, and the lengthy consideration given this case in this court it would be captious for us to dismiss the action and to require the appellant to institute a proceeding under Section 10 of the Administrative Procedure Act, 5 U.S.C.A. § 1009. We will treat the complaint as if it were based upon the Administrative Procedure Act and will direct the court below to so treat it. We will also direct the court below to stay the deportation of the appellant pending application to the Attorney General for discretionary relief pursuant to Section 1254, Title 8 U.S.C.A.
 
 
 
 Notes:
 
 
 [1]
 McLeod's uncontradicted testimony as to the representations made to him at the 1956 hearing was as follows:
 "A. He [the Special Inquiry Officer] stated to me that in the area from which I had originated, that they only allowed a small quota of people to come to the United States, and he [51] said to me and to Mrs. McLeod it was being unfair to extract one quota number from that allotment to apply to me, due to the fact that I am already here and if I would have my wife to apply for me to re-enter the United States I could do so on a non-quota entry.
 "And he asked did I want to do that and I said, yes, as long as it would permit me to return to my family and he said to Mrs. McLeod, I realize you have shown to me medical reports and I can see you are not well, but I would not be able to do this otherwise, because it would not be fair, and Mr. McLeod wouldn't have to be out very long, perhaps a couple of months.
 "And I turned to you and asked your opinion and then you came — well, there was further discussion — I don't know.
 "Q. At that time were any promises made to you by anyone there that you would receive help in returning to the United States? A. Yes, Mr. Benson told me that he would inform Mrs. McLeod how to get these forms and where they could be obtained, and that she could fill them out and she should do it right away, the faster she did it, the better, and this would help me to get back and they would assist her in any way she required.
 * * * * * *
 "A. I was there with my daughter, she was [62] sitting in my lap, she was about three years old, and I had told Mr. Milich previously that we only had, in all our assets, less than $300, and why would he want to send my family to the poor house, and my daughter to an institution.
 "And my wife was very ill and she began to cry, and Mr. Benson came over and talked to her and I went over and he said, now look, McLeod, this is not as bad as you think it is. We know your situation, but there is nothing we can do but make this ruling.
 "It will require nothing more than a few weeks. That if you need anything to be done, you call the Service and we will do all we can to help you.
 "He then told her how to obtain the forms that she would use, what she would need to do to have them processed, and said that it would require nothing more than a little absence, as we are going to try to work out something to help Mr. McLeod and his family.
 "I turned to Mr. Prior and asked him what must I do as I did not want to leave my family in the condition that they were, especially my very infant daughter.
 "Mr. Prior came over and they talked a while. I couldn't hear all of the conversation. Mr. Benson came over, shook hands with me, talked and said, well we will [63] be seeing you soon and we will help you all we can.
 "He talked to Mrs. McLeod, played with Darlene, the baby, and we all left smiling and happy.
 "Therefore, I thought then I would just make up my mind and go. I left them $205, hoping it would last for six weeks. I had no other assets, no job, no savings, and no other monies of any sort."