Graziano DIMINICH, Plaintiff-Appellant,

v.

P. A. ESPERDY, as District Director of the Immigration & Naturalization Service, New York District, Defendant-Appellee.

No. 90, Docket 27086.

United States Court of Appeals Second Circuit.

Argued Nov. 29, 1961.

Decided Dec. 29, 1961.

Certiorari Denied April 9, 1962.
See 82 S.Ct. 875.

Alfred Feingold, New York City, for plaintiff-appellant.

Roy Babitt, Special Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty. for Southern District of New York, New York City), for defendant-appellee.

Before CLARK, FRIENDLY and KAUFMAN, Circuit Judges.

FRIENDLY, Circuit Judge.

Diminich, a Yugoslav seaman who entered the United States illegally, appeals from an order of Judge MacMahon in the District Court for the Southern District of New York, which granted a motion for summary judgment by the District Director of the Immigration and Naturalization Service in an action to annul an order refusing to withhold deportation. The order resulted from an

application for relief under § 243(h) of the Immigration Act of 1952, 8 U.S.C.A. § 1253, which authorizes the Attorney General "to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecution and for such period of time as he deems to be necessary for such reason." A Special Inquiry Officer of the Service, who had heard Diminich, recommended denial, and the Regional Commissioner for the Northeast Region, to whom the Attorney General has delegated his authority, 8 C.F.R. § 243(b)(2), followed that recommendation.

█ Before addressing ourselves to the issues raised with respect to § 243(h), we shall rule on an alternative contention based on § 15(a)(3) of the Act of September 11, 1957, 71 Stat. 643, which authorizes consular officers to issue certain non-quota immigrant visas remaining from those authorized by the Refugee Relief Act of 1953, 50 U.S.C.A. Appendix §§ 1971–1971q, to "refugee-escapees," defined as including "any alien who, because of persecution or fear of presecution on account of race, religion, or political opinion has fled or shall flee (A) from any Communist, Communist-dominated, or Communist-occupied area * * * *" as expanded by regulations, 8 C.F.R. § 245.1, permitting District Directors, upon application, to adjust the status of certain aliens under that section without the necessity of departure from the country if the State Department's Office of Refugee and Migration Affairs finds the alien qualified and allocates a visa. Although Diminich made no application under the 1957 Act, he contends that the District Director was bound to advise him of the possibilities that might, or might not, be open thereunder. We find no basis for so holding; and the Regulation has now been amended so as not to apply to crewmen. So we return to § 243(h).

█ Diminich was born January 11, 1938, at San Lorenzo di Albona, then in Italy, now in Yugoslavia. He began work as a seaman late in 1955. He deserted his vessel in Italy in November, 1956, avowedly in protest against being urged to attend Communist meetings on board and also for fear "they would put me ashore—out of work, because they didn't like anybody to go to church"; he remained in refugee camps in Italy until the summer of 1957, when he shipped on the "Anna Maersk," a Danish vessel. This he deserted on October 15, 1957, in New York, allegedly for the same reasons as his previous desertion in Italy. He was apprehended on April 2, 1959; a warrant of deportation, a petition under § 243(h), and a hearing swiftly followed.

At the hearing before the Special Inquiry Officer, Diminich testified that neither he nor any member of his family in Yugoslavia had been arrested "or in trouble with the authorities" since 1945 when an uncle was killed, allegedly "because he was against Communism"; however, the authorities "made difficulties for me inasmuch as they wanted me to join the Communist Party while I was there and I wouldn't do that; and when I was at home and I wanted to go to Mass they prevented me from doing so." He feared that if he were to return to Yugoslavia, he would be imprisoned, for "perhaps two years," "for the fact that I left and deserted my vessel and that proves that I am against Communism." On the other hand, he admitted that he was never deprived of an opportunity to earn a living in Yugoslavia despite his allegedly known anti-Communist views and religious devotion, and that his father is employed. The Special Inquiry Officer concluded that the application should be denied for lack of proof, and the Regional Commissioner for the Northeast Region, considering the evidence at the hearing "and other pertinent evidence and available information," so ordered.

If this were all, the case would not differ significantly from other deportation cases of Yugoslav seamen where the evidence has been held insufficient to warrant overturning the determination of the Attorney General or, more real-

istically, of his delegate, Jay v. Boyd, 351 U.S. 345, 76 S.Ct. 919, 100 L.Ed. 1242 (1956), to whom Congress has confided discretion and who has access to information, not available to a reviewing court, against which the seaman's assertions must be weighed. See United States ex rel. Dolenz v. Shaughnessy, 200 F.2d 288 (2 Cir. 1952), cert. denied 345 U.S. 928, 73 S.Ct. 780, 97 L.Ed. 1358 (1953) [under predecessor statute that "no alien shall be deported under any provisions of this chapter to any country in which the Attorney General shall find that such alien would be subjected to physical persecution"]; United States ex rel. Dolenz v. Shaughnessy, 206 F.2d 392 (2 Cir. 1953); Sunjke v. Esperdy, 182 F. Supp. 599 (S.D.N.Y.1960), appeal dismissed April 13, 1960 (2 Cir.), cert. denied sub nom. Roncevich v. Esperdy, 364 U.S. 815, 81 S.Ct. 43, 5 L.Ed.2d 46 (1960); Blazina v. Bouchard, 286 F.2d 507 (3 Cir. 1961), cert. denied 366 U.S. 950, 81 S.Ct. 1904, 6 L.Ed.2d 1242 (1961). As in Blazina's case, the most reasonable inference from Diminich's testimony that he would be imprisoned on returning to Yugoslavia is that this would be punishment for desertion of his vessel, "a criminal sanction that is reconcilable with generally recognized concepts of justice," 286 F.2d at 511. Beyond that, Diminich's claims were simply of "difficulties"; repugnant as we find such interference with religious observance and freedom of association to be, "difficulties" are not the "physical persecution" which Congress chose to make the sole factor warranting a stay of deportation,[1] see 286 F.2d at 511, even if the Commissioner were required to credit Diminich's assertions, as he was not.

However, Diminich presses an additional point upon us. The background for this is the ruling of the Commissioner of Immigration in October, 1956, deferring action on the application of John Martinovich, who had made allegations of probable harsh treatment because of Catholic and anti-Communist sentiments, and of all other Yugoslav nationals making similar assertions, in order to allow the Service to collect reliable information as to conditions in Yugoslavia. This order was withdrawn on February 1, 1958, and the determinations of the Service resulting from its investigation were shortly set forth in a decision by the Assistant Commissioner of the Enforcement Division in Matter of Kale, Adm. Dec. A9 555 532, which, in May, 1958, was forwarded to Regional Commissioners with instructions that decisions as to all Yugoslav crewmen who had entered since 1945 and had been in Yugoslavia at some time since that date should be "based upon the criteria" stated therein. The decision stated that "various sources, including the personal observations of officers of this Service" in Yugoslavia had established that "The Government of Yugoslavia is completely under the domination and control of the Communist Party of Yugoslavia"; that "Advancement in almost any line of activity is, with few exceptions, limited to Party members"; that "The basic freedom to criticize, as we know and enjoy it, does not exist in Yugoslavia"; that "On the other hand, churches throughout the country are open for public worship and religious assembly and they are being maintained and repaired, obviously with Government permission, if not with its approval or support"; and that Yugoslavia had granted asylum to thousands of anti-Communist Hungarians. In the light of this, the Service found Kale's contentions, quite similar to Diminich's, to be without merit: Possible punishment for desertion "is not the physical persecution contemplated by the statute. Physical persecution contemplates incarceration or subjection to corporal punishment, torture, or death based usually on one's race, religion or political opinions." As to Kale's other fears, "Economic sanctions applied against those not members of the controlling clique in a coun-

---

1. The contrast in this respect between the language of § 243(h) and of § 15(a) (3) of the Act of September 11, 1957, is notable.

try whose economic system is completely and rigidly state-controlled is not physical persecution."

Appellant's counsel reads the Kale decision as a determination by the Service that complete withdrawal of all employment opportunities would not be "physical persecution,"—an interpretation of § 243(h) condemned, without disagreement on that point, in Dunat v. Holland, 297 F.2d 744 (3 Cir. 1961), now pending before the court *in banc*, with which, in that aspect, we fully agree. Looking at the Kale decision alone, we would not read it as counsel does. The statement that "Physical persecution contemplates incarceration" etc. was made in answering Kale's argument as to imprisonment for jumping ship; the emphasis was on the second half of the sentence, dealing with the cause of the sanction, not on the first, describing its nature. The statement that "economic sanctions" are not physical persecution, when read in context, does not go to the extent of saying that complete withdrawal of employment opportunities would not be.

However, appellant's counsel argues that no matter how we might otherwise have read Kale, what happened to Dunat shows that his reading is the right one. That case, also of a Yugoslav seaman, went beyond the norm in that Dunat had testified he was sure he would get no more employment in Yugoslavia and that members of his family who refused to sign papers saying they were not members of a church had been denied "any kind of work or means of support," and a Catholic priest, who had left Yugoslavia in 1943 but said he had frequent contacts with individuals there, testified that "the government" had refused employment to "Generally everybody" who practiced their religion—whether this meant all jobs or only government jobs is not clear. The Special Inquiry Officer recommended denial, pointing out that Dunat's family had not been physically persecuted for attending church "even though it should be established that they are denied certain types of employment," and continued "The fact that the applicant might be

denied employment for church membership or for failure to join the Communist Party is likewise not within the import of the term 'physical persecution.'" The Regional Commissioner for the Southeast Region, on the basis of the transcript and "all the reliable additional information made available to me through official government channels, pertinent to the proper disposition of this application," decided there were "insufficient grounds to support a finding that the applicant would be subject to physical persecution if deported to Yugoslavia." A majority of the panel, Senior Judge Forman dissenting, held that by this action the Commissioner had, in effect, construed "physical persecution" as not including "the denial of an opportunity to earn a livelihood," which was "the equivalent of a sentence to death by means of slow starvation and none the less final because it is gradual," and directed a stay of deportation.

■ Appellant argues (1) that this shows the Attorney General's delegates have been following the erroneous view that denial of all employment opportunity is not "physical persecution," and (2) that established principles as to the review of administrative action, stated in S. E. C. v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943), require, under such circumstances, a remand for redetermination under a correct interpretation of the statute, even though his own evidence not only failed to show the likelihood of denial of all employment opportunity but rather negated it.

We cannot accept the argument, however much we commend the zeal and ingenuity of counsel in making it. The first branch would require us to agree with the majority of the panel in the Third Circuit that the Special Inquiry Officer there construed the statute as appellant contends and that the Commissioner for the Southeast Region adopted that construction, and then attribute the view of that Commissioner to the Commissioner for the Northeast Region. We are unable to take any of these steps—

much less all. The Special Inquiry Officer's reference to physical persecution contemplating the application of physical force based on race, religion or political opinion was copied from Kale and, like it, was directed to the argument about imprisonment for jumping ship. Although his statement that denial of employment for church membership or failure to join the party was not "physical persecution" could have been more clearly expressed, we would read it, along with the immediately preceding sentence, to refer only to denial of "certain types of employment." Even if the Special Inquiry Officer erred as appellant contends, the Southeast Regional Commissioner need not have shared the error; "the reliable additional information made available * * * through official government channels" might have convinced him that Dunat's claims were exaggerated. The only basis for a contrary conclusion, or for attributing any error on his part to the Commissioner for the Northeast Region, would be if the Kale decision itself had said that denial of all employment was not physical persecution; to us it did not do that.

The second branch of the argument also would take us into areas we are unwilling to enter. How far the courts in reviewing action under § 243(h) may properly consider the standard employed by the Attorney General's delegates, as distinguished from procedural fairness,[2] although they would have no means of knowing whether standards decreed by them were being applied in the light of the extra-record material the deciders necessarily use, comes sufficiently close to problems discussed in Chicago & Southern Air Lines v. Waterman S.S. Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L. Ed. 568 (1948), that we must reserve that issue for a case requiring its decision. Moreover, we doubt that the Chenery decision ought be pressed as far as it would have to be to assist plaintiff here. There the reviewing court could

not tell whether the administrative agency, proceeding on the only basis the court deemed within the agency's power, would reach the same result the agency had reached on an erroneous basis. Here the application of a correct standard to the facts as testified by Diminich would produce the same result already reached; in such a case remand is not normally required, see Chae-Sik Lee v. Kennedy, 294 F.2d 231 (D.C.Cir. 1961). The only ground for a contrary argument would be that here the transcript is not all there is, and that other evidence in the Government's possession might show appellant's prospects in Yugoslavia to be even worse than he thought; in the light of what was said in the Kale decision and in the Special Inquiry Officer's report in this case, that possibility seems too theoretical and remote to call for a remand.

Affirmed.

2. See the two Dolenz decisions and Blazina v. Bouchard, cited above, and Judge [as he then was] Harlan's opinion in United

States ex rel. Leong Choy Moon v. Shaughnessy, 218 F.2d 316, 318 (2 Cir. 1954).