Attillio ZUPICICH, Plaintiff,

v.

P. A. ESPERDY, as District Director of the Immigration and Naturalization Service for the District of New York, Defendant.

United States District Court
S. D. New York.
July 11, 1962.

Robert J. Carluccio, Hoboken, N. J., for plaintiff.

Robert M. Morgenthau, U. S. Atty., S. D. N. Y., by Herbert P. Rickman, New York City, for defendant.

EDELSTEIN, District Judge.

The plaintiff, a Yugoslav seaman, seeks judicial review of the Attorney General's order denying his application for withholding of deportation under § 243(h) of the Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1253(h).[1] The defendant has moved for summary judgment upon the ground that there is no genuine issue as to any material fact, and that he is entitled to judgment as a matter of law.

Zupicich entered the United States on May 22, 1959, as a non-immigrant crewman, and was authorized to remain for the period of time that his vessel remained in port. By remaining beyond the permissible period he became deportable pursuant to § 241(a) (2) of the Act, 8 U.S.C.A. § 1251(a) (2), and on March 21, 1960, he was ordered deported. Plaintiff then applied for withholding of deportation to Yugoslavia under § 243(h) of the Act, upon the ground that he would be subjected to physical persecution upon his return there. The application to withhold deportation was heard before a Special Inquiry Officer, as authorized by the regulations, 8 C.F.R. § 243.3 (1958), who, on June 7, 1960, recommended that the application be denied. The Acting Regional Commissioner, the Attorney General's delegate, followed the recommendation, and on June 30, 1960, ordered that the plaintiff's application for withholding of deportation to Yugoslavia be denied. A motion to reconsider was denied on September 22, 1960.

Before considering plaintiff's claim that the Attorney General's discretion under § 243(h) was exercised in

1. 66 Stat. 212, 8 U.S.C.A. § 1253(h):
    "The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecution and for such period of time as he deems to be necessary for such reason."

an arbitrary and capricious manner so as to deprive plaintiff of due process of law, I must dispose of the threshold question of whether the enactment of P.L. 87–301, § 5(a), 75 Stat. 650 (1961) 8 U.S.C.A. § 1105a, has deprived this court of its long established jurisdiction to review the Attorney General's determinations under § 243(h) of the Act. P.L. 87–301 provides that the judicial review provisions of the Administrative Procedure Act, as amended, 5 U.S.C.A. § 1031 et seq., shall be the sole and exclusive procedure for review of all final orders of deportation. The venue provisions of the 1961 legislation make all final orders of deportation reviewable in the Court of Appeals. 8 U.S.C.A. § 1105a(a) (2). Plaintiff urges that this action should be heard in the Court of Appeals and not in this court. Although he has made no more than a bare allegation to that effect, it would seem that his contention must be that the new Act is an exclusive procedure for judicial review of *all* orders of deportation and exclusion, and further, that an order denying withholding of deportation is such a deportation order that is controlled by the Act, and, consequently, by its venue provisions. A review of the statute's

legislative history, as well as some inquiry into the history of judicial review of deportation orders is necessary for a determination of the issue.

The new statute, now § 106 of the Immigration and Nationality Act, 8 U.S.C.A. § 1105a, became effective on October 26, 1961. It prescribed for the first time a sole and exclusive statutory scheme for "judicial review of all final orders of deportation heretofore or hereafter made against aliens within the United States pursuant to administrative proceedings under Section 1252(b) of this title * * *," i. e., § 242(b) of the Immigration and Nationality Act of 1952. The explicit aim of the section was to prevent protracted delays in the execution of deportation and exclusion orders which, in the opinion of Congress, had been caused by repetitive actions for judicial review of claimed improprieties in the proceedings.[2] Such repetitive appeals were facilitated by the increase in remedies available to an alien seeking to review a deportation order. Prior to 1955, a deportation order could be challenged only by a habeas corpus proceeding which was available to the alien after he had been taken into custody.[3] Thereafter, additional judicial review remedies

2. "The Committee on the Judiciary has been disturbed in recent years to observe the growing frequency of judicial actions being instituted by undesirable aliens whose cases have no legal basis or merit, but which are brought solely for the purpose of preventing or delaying indefinitely their deportation from this country. * * * Without any reflection upon the courts, it is undoubtedly now the fact that such tactics can prevent enforcement of the deportation provisions of the Immigration and Nationality Act by repetitive appeals to the busy and overworked courts with frivolous claims of impropriety in the deportation proceedings." H.R.Rep. No. 1086, 87th Cong., 1st Sess. (1961), reprinted in 2 U.S.Code Cong. & Ad.News 2950, 2967, 87th Cong., 1st Sess. (1961).

For a detailed account of the legislative history, together with an extensive review of the problem of judicial review in immigration matters, see Comment, Deportation and Exclusion: A Continuing Dialogue Between Congress and the

Courts, 71 Yale L.J. 760 (1962). See also H.R.Rep. No. 565, 87th Cong., 1st Sess. (1961), containing full report on Public Law 87–301; Hearings on H.R. 13311 before Subcommittee No. 1 of the House Committee on the Judiciary, 85 Cong., 2nd Sess. (1958) (a predecessor of the bill.) For the debates, see 107 Cong.Rec. 1138 (Daily ed., July 10, 1961); 107 Cong.Rec. 18462–70 (Daily ed. Sept. 15, 1961). For debates on a predecessor bill, see 105 Cong.Rec. 12723–12729 (1959).

3. The Immigration and Nationality Act of 1952, § 242(c), provides that an alien may be detained for a limited period pending removal in deportation. 66 Stat. 210 (1952), 8 U.S.C.A. § 1252(c). Heikkila v. Barber, 345 U.S. 229, 73 S.Ct. 603, 97 L.Ed. 972 (1952) held that under the Immigration and Nationality Act of 1917, Section 10 of the Administrative Procedure Act could not be extended to provide judicial review other than by habeas corpus. Batista v. Nicolls, 213 F.2d 20, (1st Cir. 1954) (accord).

became available as a result of the Supreme Court decisions in Brownell v. Rubinstein, 346 U.S. 929, 74 S.Ct. 319, 98 L.Ed. 421 (1954), and Shaughnessy v. Pedreiro, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955). The Court held that deportation orders entered under the Immigration and Nationality Act of 1952 could be judicially reviewed in actions for declaratory judgment and injunctive relief under § 10 of the Administrative Procedure Act, 5 U.S.C.A. § 1009. The decision in Pedreiro set the high-water mark in judicial review of deportation orders. Following the decision in Pedreiro, an alien subject to a deportation order, having lost in a declaratory judgment or injunction proceeding, could thereafter sue out a writ of habeas corpus when taken into custody. Moreover, prior to the passage of the new bill it was possible to seek relief by habeas corpus repeatedly.[4] This increase of judicial proceedings in immigration matters provided the stimulus for the present congressional attempt to regulate the availability of judicial review.[5]

Congress sought to remedy what it considered to be the undesirable practice of permitting aliens to utilize repetitive appeals for judicial intervention which served to delay execution of deportation orders. This was accomplished by shortening the statute of limitations for bringing a petition for review, by limiting the available remedies, and by having direct review of final orders in the Court of Appeals. Thus, under the new bill, an alien ordered deported must bring a "petition for review,"[6] rather than an action for declaratory judgment or injunction, and this special statutory review proceeding must be instituted not later than 6 months from the date of the final order of deportation. The action may no longer be brought in a district court, but only in the Court of Appeals of the circuit where the alien resides or the circuit where the order originated. The right to habeas corpus is explicitly retained and is exempt from the jurisdictional provisions limiting the statutory petition. Opportunities for relitigation of the deportation order have been limited by a provision requiring every petition for review or for habeas corpus to state whether the validity of the order has been upheld in any prior judicial proceeding. Petitions for review and writs of habeas corpus will no longer be entertained if the validity of the order has been previously determined in a criminal or civil proceeding, unless the court finds that grounds which could not have been presented in the prior proceeding are found to exist, or that the remedy provided by the prior proceeding was inadequate to test the validity of the order. 8 U.S.C.A. § 1105a(a) (1), (a) (2), (a) (9), (c).

With this legislative and historical background at hand, the court passes to the question presented: Is an order denying an application for withholding of deportation, entered pursuant to Section

---

4. See H.R.Rep. No. 1086, 87th Cong., 1st Sess. (1961) (Letter from Deputy Attorney General Byron R. White to Chairman).

5. " * * * There is a pressing need for legislation which will provide a single form of review of immigration and nationality cases after the administrative process has been completed. It has been demonstrated that the existing legal structure permits repetitive appeals to the courts, testing over and over again the same subject matter long after the alien has had his full day in court. This only has served to delay and confound * * *." 105 Cong.Rec. 12729 (1959) (Remarks of Representative Lindsay).

6. The use of the term "petition for review" indicates the need for resort to a special statutory proceeding, which will render inapplicable the provision of § 10(b) of the Administrative Procedure Act allowing any proper writ. 60 Stat. 243 (1946) 5 U.S.C.A. § 1004(b). Under the APA any applicable writ could be used in the absence of a special statutory proceeding, and the most common writs were injunctions, e. g., Shaughnessy v. Pedreiro, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955), and declaratory judgments, e. g., Brownell v. We Shung, 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed.2d 225 (1956).

243(h) of the Act, a "final order of deportation" which is subject to judicial review by the Court of Appeals, and not by this court?

While it is true that the Act aims to expedite the enforcement of immigration orders, the statutory language indicates quite clearly that the judicial review procedure is not to apply indiscriminately. Contrary to the plaintiff's position, the language indicates that the statute is to apply only to "final" orders entered in administrative proceedings conducted pursuant to § 242(b) of the Act, 8 U.S.C.A. § 1252(b), and not to the review of the Attorney General's opinion or judgment, as exercised under § 243(h).[7] Section 242(b) empowers the Special Inquiry Officer, who is authorized to conduct such proceedings, to "make determinations including orders of deportation. * * *" He is authorized to determine deportability, to suspend deportation and to authorize voluntary departure. 8 C.F.R. 242.8(a) (1958). Determinations of deportability are made solely upon the record in the administrative proceedings conducted by the Officer. Upon a finding that an alien is deportable, pursuant to § 241 of the Act, 8 U.S.C.A. § 1251, the officer enters an order of deportation, which aside from review by appropriate judicial remedies, is considered final. 8 C.F.R. 242.20 (1958).

However, the kind of determination involved in the question of whether or not deportation should be withheld under § 243(h) of the Act is different. Under § 243(h), the role of the Special Inquiry Officer does not involve adjudication, as it does under § 242(b). Under § 242(b), the final administrative determination as to deportability rests with the Special Inquiry Officer. The authority to withhold deportation under § 243(h), however, rests clearly with the Attorney General or his delegate, the Regional Commissioner. 8 C.F.R. 243.3 (1958); Jay v. Boyd, 351 U.S. 345, 76 S.Ct. 919, 100 L.Ed. 1242 (1956). Pursuant to the authority vested in him by § 103(a) of the Act, 8 U.S.C.A. § 1103(a), the Attorney General has prescribed regulations which have the force and effect of law. United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 265, 74 S.Ct. 499, 98 L.Ed. 681 (1954). Under the regulations for § 243(h) of the Act, if an alien requests a withholding of deportation on the ground that he would be physically persecuted if deported to the country designated by the Immigration and Naturalization Service, he is requested to appear before a Special Inquiry Officer for a hearing under oath. The Special Inquiry Officer then prepares his findings and forwards a recommendation to the Regional Commissioner. Thus, the role of the Special Inquiry Officer under § 243(h) is that of a fact finder and the hearing held by him is preliminary to the final decision on withholding of deportation. The decision to withhold deportation and, if so, for what period of time, rests finally not with the Special Inquiry Officer but with the Attorney General or his delegate, to be exercised by him according to his own judgment. His judgment and determination is based not only upon the special facts of each case elicited through the administrative proceedings, but also upon information and knowledge obtained through governmental channels as to the political conditions in a particular country. See Diminich v. Esperdy, 299 F.2d 244 (2d Cir. 1961); Blazina v. Bouchard, 286 F.2d 507 (3rd Cir. 1961); Batistic v. Pilliod, 286 F.2d 268 (7th Cir.

---

7. The administrative procedure for determining the deportability of an alien is set out in § 242(b) of the Act, 8 U.S.C.A. § 1252(b), and the regulations thereunder, 8 C.F.R. §§ 242.1–.21. The alien must be apprised of the specific charges against him, may have counsel present at the hearing, may present evidence, and may examine and cross examine witnesses. Determinations of deportability "shall be made only upon a record made in a proceeding before a Special Inquiry Officer" and must be "based upon reasonable, substantial and probative evidence." The Special Inquiry Officer who presides at the hearing may not be one who participated in the investigative or prosecuting phases of the case.

1961). Furthermore, the venue provisions of the new statute, § 106(a) (2) of the Act, lend additional support to the conclusion that the new review provisions were not intended to cover § 243(h) determinations. In setting the venue for a petition for review, the section refers to "administrative proceedings before a special inquiry officer * * *." Thus, Congress was not unmindful of the role of the Special Inquiry Officer in deportation proceedings. Since the new statute is aimed at accelerating review of final determinations of deportability made in administrative proceedings within the province of the Special Inquiry Officer under § 242(b), the denial of an application to withhold deportation, involving as it does a different kind of determination made by the Attorney General under § 243(h), cannot properly be construed to be within the coverage of P.L. 87–301.[8]

The legislative history of the statute confirms the interpretation that Congress did not contemplate including discretionary decisions of the Attorney General within the exclusive review procedure. The dominant theme recurring in the congressional debates, was that repeated judicial review of "deportation orders" allowed the "same subject matter" to be tested "over and over again, ) and resulted in delay and confusion. In a proceeding under § 242(b), the "subject matter," to use the Congressional phraseology, is whether or not the alien is within one of the deportable classes enumerated in § 241 of the Act. On the other hand, the "subject matter" in a proceeding on an application to withhold deportation, pursuant to § 243 of the Act, is whether or not the alien, in the opinion of the Attorney General, will be physically persecuted. Thus, in expressing its disapproval of relitigation of the "same subject matter" in "orders of deportation," Congress was concerned with recurrent review of the question of deportability, made pursuant to § 242(b). Viewed in light of this legislative history it appears that orders entered pursuant to § 243(h) were not to be covered by the new review statute, since an application to withhold deportation does not traverse subject matter already considered in a proceeding to deport, pursuant to § 242(b).

In expressing dissatisfaction with the frustration of immigration policy by the use of recurrent review the debates and committee reports discuss the problem solely with relation to "orders of deportation" and "final orders of deportation."[10] Needless to say, an order denying the withholding of deportations is not a final order of deportation. All that such a denial accomplishes is to affirm a prior adjudication of deportability and bring the alien one step closer to the execution and enforcement of the final order, which was previously entered. Specific examples cited by Congress of situations where delay resulted from repeated review indicate clearly that the evil which Congress sought to obviate was the relitigation of final determinations of deportability. In the debate on H.R. 2807, the forerunner of the present enactment, the cases cited as examples of flagrant abuse of the judicial review procedure describe situations in which

---

8. There are other significant differences between the proceedings under the respective sections. The request by an alien for a withholding of deportation based upon a claim of physical persecution is separate and distinct from the deportation proceedings conducted pursuant to § 242(b). And the grant of a withholding of deportation is authorized "for such period of time as [the Attorney General] deems to be necessary * * *." The withholding of deportation does not result in the non-entry of a deportation order as does a grant of suspension of deportation or voluntary departure. In fact, the withholding proceedings do not become operative until after a deportation order has been entered. Thus, it is evident that the review in this court is not a review of a final order of deportation nor of either of the other determinations which a Special Inquiry Officer makes.

9. 105 Cong.Rec. 12728–12729 (1959).

10. Ibid. (Remarks of Committee Chairman Moore on H.R. 2087, 86th Cong., 1st Sess. (1959).

review of the *final* order was repeatedly sought.[11] And the discussion as to each of these cases is keyed to the delay in the execution of the final deportation order, "issued pursuant to administrative deportation proceedings," culminating in a warrant of deportation.[12]

The tenor of the Committee Reports and the debates indicates a concern with a particular problem:—delay in the execution and enforcement of a final determination of deportability when such a determination is based on a record in an administrative hearing. There is no evidence in the legislative history that Congress, in enacting P.L. 87–301, § 106 of the Act, was motivated by a desire to shortcut the review of the Attorney General's discretion. And it is clear that Congress did not contemplate that the present action would no longer be cognizable in this court. The court therefore holds that an order denying the withholding of deportation pursuant to Section 243(h) of the Immigration and Nationality Act of 1952 is not "a final order of deportation made pursuant to administrative proceedings," and is, therefore, subject to review in the District Court.[13]

■ Turning now to the issues raised by the denial of the application to withhold deportation under § 243(h) of the Act, the plaintiff contends that the Attorney General's failure to find that he would be subjected to physical persecution upon his return to Yugoslavia constituted an "improper exercise of execu-

11. The résumés of several cases were inserted in the Congressional Record by Chairman Walter as examples of the problem which the statute sought to resolve. 105 Cong.Rec. 12727 (1959).

12. Ibid.

13. Pursuant to the Act, new regulations were promulgated which change the procedure for § 243(h) applications to withhold deportation. 26 Fed.Reg. 12112 (Dec. 19, 1961). 8 C.F.R. 242.17(c) (Supp. 1962) provides that, as part of the administrative proceedings before the Special Inquiry Officer to determine deportability, the alien shall be advised that he may apply for temporary withholding of deportation pursuant to § 243(h) of the Act. The application may be made only during the hearing before the Special Inquiry Officer, 8 C.F.R. 242.17(d) (Supp. 1962), whereas formerly it was made in a separate proceeding. See note 8 supra. 8 C.F.R. 242.18 (Supp.1962) sets forth the requirements for the contents of the decision of the Special Inquiry Officer. Decision on the application to withhold deportation, 8 C.F.R. 242.17 (Supp.1962) is included therein. The former regulation, 8 C.F.R. 243.3 (b) (2) (1958) which provided that the decision on withholding of deportation was to be made by the Regional Commissioner, has been eliminated. Thus, under the new regulations, the Attorney General has delegated the decision on withholding deportation to the Special Inquiry Officer.

The new regulations attempt to make the adjudication of § 243(h) applications part of the administrative proceedings conducted before the Special Inquiry Officer and attempt to make the order granting or denying withholding of deportation part of the final order of deportation. Whether this will result in review of § 243(h) applications directly in the Court of Appeals, as seems to be the intent of the new regulations, is a question the resolution of which must await an appropriate case. In Blagaic v. Flagg, 304 F.2d 623, the Seventh Circuit reached a result contrary to that reached here. The case there also arose under the regulations in force before January 1962. The Court held that a § 243 (h) application was reviewable initially in the Court of Appeals. See also Roumeliotis v. Immigration and Naturalization Service, 304 F.2d 453 (7th Cir.) (visa petition). In Giova v. Rosenberg, 308 F.2d 347, Ninth Circuit, 1962, however, the Ninth Circuit dismissed an appeal brought under the new statute to review a denial of a motion to reopen a *deportation proceeding*. And in Mai Kai Fong v. Immigration and Naturalization Service, 305 F.2d 239, Ninth Circuit, 1962, the same Court found that it had no jurisdiction under the new statute to review a notice that the alien would be deported to Hong Kong. The Court held that the notice was at best an order pursuant to § 243 of the Act. Thus, the Ninth Circuit indicated a strict construction of P.L. 87–301 which would not enlarge the matters to be reviewed initially in the Court of Appeals beyond "final orders of deportation." I am in accord with the view of the Ninth Circuit as it applies to cases arising under the regulations in force prior to January 1962.

tive judgment." The exercise of the Attorney General's discretion as to whether or not the alien will suffer physical persecution upon his return to a particular country is a decision made, in part, on the basis of facts obtained by the Attorney General through political and diplomatic channels. The courts have recognized that an application under § 243(h) seeks a determination of actual political conditions within a particular country, and that, in formulating his opinion, the Attorney General has access to State Department material and intelligence information which is unavailable to a reviewing court. Diminich v. Esperdy, 299 F.2d 244, 246 (2d Cir. 1961); Blazina v. Bouchard, 286 F.2d 507 (3d Cir. 1961); Batistic v. Pilliod, 286 F.2d 268 (7th Cir. 1961); United States ex rel. Dolenz v. Shaughnessy, 206 F.2d 392 (2d Cir. 1953). Courts have repeatedly said that the favorable exercise of the Attorney General's discretion in granting "an application for suspension [of deportation] * * * is manifestly not a matter of right under any circumstances, but rather is in all cases, a matter of grace." Jay v. Boyd, 351 U.S. 345, 354, 76 S.Ct. 919, 100 L.Ed.2d 1242

(1956); Chao-Ling Wang v. Pilliod, 285 F.2d 517 (7th Cir. 1960); Cakmer v. Hoy, 265 F.2d 59 (9th Cir. 1959). The deportable alien is not, however, without rights. He has a right to have his application considered in accordance with the pertinent regulations promulgated by the Attorney General. Blazina v. Bouchard, supra, 286 F.2d at 511. He has a right to full opportunity to offer proof in support of his application. United States ex rel. Leong Choy Moon v. Shaughnessy, 218 F.2d 316 (1954). He has a right not to have the application arbitrarily or capriciously denied. And he has a right to a hearing conducted in a manner that is not manifestly unfair to him.[14]

In recognition of the political nature of the Attorney General's decision as to conditions relating to physical persecution within a particular country, judicial review has been limited to the question of whether or not the Attorney General's discretion has been arbitrarily or capriciously exercised. Diminich v. Esperdy, supra; Blazina v. Bouchard, supra.

At the hearing before the Special Inquiry Officer, the applicant testi-

14. As to the fairness of the hearing, Jay v. Boyd, 351 U.S. 345, 76 S.Ct. 919, supra, held that in a proceeding to *suspend* deportation pursuant to Sec. 244 of the Act, 8 U.S.C.A. § 1254, the government may rely upon information not disclosed or presented at the hearing only if there is a prior finding that disclosure would jeopardize the security interests of the United States. In Milutin v. Bouchard, 299 F.2d 50 (3rd Cir.1962) the Supreme Court vacated a Third Circuit judgment which denied a stay of deportation based on undisclosed information without a prior finding that disclosure would be prejudicial to the interests of the United States. 370 U.S. 292, 82 S.Ct. 1562, 8 L.Ed.2d 501 (June 18, 1962). The basis of the Supreme Court's order was that under the new regulations, effective January 22, 1962, the Special Inquiry Officer may consider information not of record only "if in the opinion of the special inquiry officer or the Board, the disclosure of such information would be prejudicial to the interests of the United States." 8 C.F.R.

242.17, 242.21 (1962 Supp.). The Court ordered the case remanded to the Immigration and Naturalization Service, with instructions to reopen the proceeding and to afford Milutin an opportunity to seek relief under Sec. 243(h) of the Act pursuant to the currently applicable regulations relating to secret evidence. The problem of secret evidence does not arise in the instant case, as there is no claim made that the Attorney General's determination was based upon such evidence. And it is clear from a review of the record that confidential information was not the basis of the decision in the case at bar.

See also Radic v. Fullilove, 198 F. Supp. 162 (N.D.Cal.1961), where the district court held that the refusal on the part of the hearing officer to permit the alien to inspect documents in a "secret" file, so that the alien could rebut, impeach or cross examine the contents, without a finding that such disclosure would prejudice the security interests of the United States, was violative of due process.

fied in his own behalf and also presented the testimony of Dr. Matthew Mestrovic, a Yugoslav writer and teacher, who had last visited Yugoslavia in 1959. Dr. Mestrovic testified concerning conditions in Yugoslavia as he knew them, with a primary emphasis on the relationship between the Catholic church in Yugoslavia and the Yugoslav government. The substance of Dr. Mestrovic's testimony was that shortly after the Communists gained control in Yugoslavia, there was a great deal of oppression of the Church, but that this oppression was not directed toward the laity but rather toward the church hierarchy. The witness also stated that "the Communist persecutions unintentionally strengthened the church, in some respects." Dr. Mestrovic very carefully distinguished between the pressure exerted on the church itself and the pressure exerted upon the ordinary layman. He testified that the government waged a campaign against the church organization, and that in his opinion it would continue to wage a determined effort to wean the young from the church and to abolish religion by various types of economic pressure. But the witness also testified that the "ordinary type of person, the farmer or laborer does not suffer any consequences from attending church because they do not have positions of any great importance * * *." He testified further that the ordinary seaman would not suffer any bodily harm, but that he might be discriminated against, however, by not being given promotions. Finally, it was Dr. Mestrovic's opinion that the Yugoslav government might imprison a seaman for a period of time as a punishment either for having deserted his ship or for having missed its sailing, but that this would have nothing to do with his devotion to Catholicism.

■ The applicant himself testified that prior to coming to the United States he had never been harmed in Yugoslavia, although he had always attended church and had expressed his dislike of the Communist form of government in many conversations with his friends. The applicant conceded that acquaintances who either had escaped from Yugoslavia or had deserted their vessels had been punished upon their return by imprisonment for a year or two and were thereupon released. But punishment for illegally deserting a vessel is "a criminal sanction that is reconcilable with generally recognized concepts of justice," Blazina v. Bouchard, supra, 286 F.2d at 511; Diminich v. Esperdy, supra, 299 F.2d at 246, and prosecution resulting from such desertion is not "physical persecution" within the meaning of § 243(h) of the Immigration and Nationality Act. The applicant further admitted that his parents, brothers and sisters still lived in Yugoslavia, that they were employed and that none of them had been persecuted or had suffered at the hands of the Yugoslav government.

It is clear that the Attorney General's discretion was reasonably exercised since there is substantial evidence in the record to justify a conclusion that the applicant would not suffer physical persecution because of his attachment to his religion. While it may be reasonably inferred that the applicant might suffer "difficulties" or "hardships" upon his return, these "'difficulties' are not the 'physical persecution' which Congress chose to make the sole factor warranting a stay of deportation, see 286 F.2d at 511 [Blazina v. Bouchard, supra], even if the Commissioner were required to credit [Zupicich's] assertions, as he was not." Diminich v. Esperdy, supra, 299 F.2d at 246. The applicant was given a full and fair opportunity to present the expert testimony of Dr. Mestrovic, and he testified at great length himself. There was no further testimony or evidence which Zupicich, or his counsel, sought to introduce. The applicant was afforded procedural due process, Shaughnessy v. Moon, supra, as the hearing was fairly conducted.

There being no genuine issue as to any material fact, defendant's motion for summary judgment is granted. Settle order on notice within ten (10) days.