**Janis Osvald DOMBROVSKIS et al., Plaintiffs-Appellants,**

v.

**P. A. ESPERDY, District Director, Immigration and Naturalization Service, United States Department of Justice, Defendant-Appellee.**

No. 379, Docket 27937.

United States Court of Appeals
Second Circuit.

Argued June 10, 1963.

Decided Aug. 7, 1963.

Edith Lowenstein, New York City, for appellants.

Roy Babitt, Special Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty. for the Southern District of New York, on the brief) for appellee.

Before MOORE, HAYS and MARSHALL, Circuit Judges.

HAYS, Circuit Judge.

The appellants, who are Yugoslav and Latvian seamen, appeal from judgments of the district court which (1) dismissed appellants' claims seeking adjustment of status from nonimmigrants to permanent-resident immigrants, 8 U.S.C. § 1255, for failure to join the Secretary of State (185 F.Supp. 478), and (2) dismissed on the merits appellants' claim that they were denied discretionary stays of deportation under Section 243 (h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h), because of an unlawful policy against granting such relief to crewmen (209 F.Supp. 673). We affirm both judgments.

Appellants are concededly deportable aliens.[1] Briefly stated, they alleged in both claims that various adverse administrative determinations affecting their immigration status had been made not on the merits of their individual applications, but as the result of a predetermined government policy against granting relief to aliens who entered the United States as crewmen.

## I.

■ The first claim relates to an attempt by appellants to have their nonimmigrant status adjusted to that of permanent resident immigrants pursuant to Section 245 of the Immigration and Nationality Act, 8 U.S.C. § 1255.[2] A prerequisite to the granting of such relief is the immediate availability of a visa. 8 U.S.C. § 1255(a) (3). Since the immigration quota applicable to each of the appellants was oversubscribed, appellants' elibility for adjustment depended on the availability of non-quota visas. Section 15 of the Act of September 11, 1957[3] authorized the allotment and issuance of such visas by "consular officers" to aliens who were "refugee-escapees." The latter term was defined to include "any alien who, because of persecution or fear of persecution on account of race, religion, or political opinion has fled or shall flee * * *

---

1. All illegally remained in this country beyond the period of time authorized as a condition of their admission as crewmen.

2. "Adjustment of status of nonimmigrant to that of person admitted for permanent residence; * * *

    "(a) The status of an alien who was admitted to the United States as a bona fide nonimmigrant may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, (3) an immigrant visa was immediately available to him at the time of his application, and (4) an immigrant visa is immediately available to him at the time his application is approved. A quota immigrant visa shall be considered immediately available for the purposes of this subsection only if the portion of the quota to which the alien is chargeable is undersubscribed by applicants registered on a consular waiting list."
    8 U.S.C. § 1255(a).
    Alternatively, appellants sought similar relief through a regulatory device known

as pre-examination. 8 C.F.R. Part 235 (a), revoked, 24 Fed.Reg. 6477 (Aug. 12, 1959).

3. "Sec. 15. (a) Notwithstanding the provisions of section 20 of the Refugee Relief Act of 1953, as amended (67 Stat. 400; 68 Stat. 1044), special nonquota immigrant visas authorized to be issued under section 3 of that Act which remained unissued on January 1, 1957, shall be allotted, and may be issued by consular officers as defined in the Immigration and Nationality Act, in the following manner:
    * * * * *
    "(3) All the rest and remainder of said visas to aliens who are refugee-escapees as defined in subsection (c).
    * * * * *
    "(c) (1) For purposes of subsection (a), the term 'refugee-escapee' means any alien who, because of persecution or fear of persecution on account of race, religion, or political opinion has fled or shall flee (A) from any Communist, Communist-dominated, or Communist-occupied area, or (B) from any country within the general area of the Middle East, and who cannot return to such area, or to such country, on account of race, religion, or political opinion. * * *"
    P.L. 85-316, 71 Stat. 639, 643.

from any Communist, Communist-dominated, or Communist-occupied area." Ibid. The applicable regulation, as amended, provided:

"A special nonquota visa shall not be held to be available under section 15 of the Act of September 11, 1957, unless the alien, having been admitted as a non-immigrant prior to April 18, 1958, has been allocated such a visa by the Director, Office of Refugee and Migration Affairs, Department of State; any alien who believes that he qualifies for such a visa may submit his application therefore, prior to June 1, 1959, to any immigration office for submission to the Office of Refugee and Migration Affairs, Department of State."

24 Fed.Reg. 3491 (May 1, 1959).[4]

Appellants and several others submitted applications for visas to the appellee, and after an initial delay (see footnote 4), the applications were forwarded by appellee to the Office of Refugee and Migration Affairs, Department of State. Three of the applications were approved, the remainder were denied for the stated reason that the applicants had not proved, as required by Section 15,[5] that they had fled from Yugoslavia or Latvia "because of persecution or for fear of persecution on account of race, religion, or political opinion."

Appellants thereupon filed an amended complaint seeking a judgment which would declare the denial of relief unlawful because it had been based not on individual consideration of the merits of appellants' applications, but on an unlaw-

ful policy directive from the Attorney General to the Department of State, directing that "refugee-escapee" visas be denied to crewmen. Judge Dimock held that the Secretary of State was an indispensable party defendant, and that since the Secretary neither had been nor could be joined, former 28 U.S.C. § 1391, 62 Stat. 935 (1948), the claim should be dismissed.

■ The gravamen of appellants' claim is that they were unlawfully denied "refugee-escapee" visas. It is clear from the statute and regulations set forth above that power over the issuance of visas resides exclusively in the consular officers and the Office of Refugee and Migration Affairs of the Department of State. See also 8 U.S.C. §§ 1101(a) (16), 1201, 1202, 1204; 22 C.F.R. (1958 rev.) parts 40, 41, 42, §§ 44.2(d), 44.3, 44.6. Appellee has no power over the issuance of visas; once he had forwarded appellants' applications for adjustment of status to the Department of State for a determination of whether visas were available, there was nothing more that he could do. The subsequent denial of appellants' applications was required by the Department's determination that no visas were available. Since appellee has no power to grant the relief sought by appellants, issuance of a decree against the appellee would be a useless act.

In Ceballos v. Shaughnessy, 352 U.S. 599, 77 S.Ct. 545, 1 L.Ed.2d 583 (1957), the Court said:

"[D]etermination of the question of indispensability of parties is dependent, not on the nature of the

---

4. At the time appellants' applications were submitted, the regulation provided:
   "A special nonquota visa shall not be held to be available under section 15 of the act of September 11, 1957, unless the alien, having been admitted as a nonimmigrant visitor or student prior to April 18, 1958, has been allocated such a visa by the Director, Office of Refugee and Migration Affairs, Department of State."

23 Fed.Reg. 6543, 6545 (Aug. 23, 1958).
   Inasmuch as none of the appellants had entered the United States as a "nonimmigrant visitor or student," appellee did not even forward their applications to the Office of Refugee and Migration Affairs (ORMA). Subsequent to the initiation of this suit, however, the regulations were amended to read as quoted in the opinion, and appellants' applications were forwarded to ORMA.

5. See note 3, supra.

decision attacked, but on the ability and authority of the defendant before the court to effectuate the relief which the alien seeks."

352 U.S. at 603, 77 S.Ct. at 547, citing Shaughnessy v. Pedreiro, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955). Cf. Blackmar v. Guerre, 342 U.S. 512, 72 S.Ct. 410, 96 L.Ed. 534 (1952). The test is whether the decree sought would "effectively grant the relief desired by expending itself on the * * * official who is before the court." Williams v. Fanning, 332 U.S. 490, 494, 68 S.Ct. 188, 189, 92 L.Ed. 95 (1947).

The Secretary of State was an indispensable party, and the claim was properly dismissed for failure to join him as a defendant. Wen Cheuk v. Esperdy, 178 F.Supp. 787 (S.D.N.Y.1959).

Appellants urge that even if we should hold that the Secretary was an indispensable party, we should remand the case to the district court to permit the Secretary to be joined as a defendant, since under the 1962 amendment to 28 U.S.C. § 1391, it would now be possible to sue the Secretary in the Southern District of New York. We decline to do so, because, as we demonstrate in Part II below, it is clear from the evidence that the claim is without foundation, and that if the Secretary were to be joined he would be entitled to summary judgment on the merits.

## II.

Appellants' second claim is that the denial by appellee of their applications for relief under Section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h), was also the result of an unlawful predetermined policy against granting such relief to crewmen.

Section 243(h) provides:

"The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecution and for such period of time as he deems to be necessary for such reason."

The documentary evidence showed that in the fall of 1956, the Commissioner of Immigration issued an order staying final determination of the applications under Section 243(h) of the Yugoslav John Martinovich (not an appellant herein) and others similarly situated. The purpose of the order was "to allow the Service to collect reliable information" on the likelihood of physical persecution of aliens deported to Yugoslavia.

"This order was withdrawn on February 1, 1958, and the determinations of the Service resulting from its investigation were shortly set forth in a decision by the Assistant Commissioner of the Enforcement Division in Matter of Kale, Adm. Dec. A9 555 532, which, in May, 1958, was forwarded to Regional Commissioners with instructions that decisions as to all Yugoslav crewmen who had entered since 1945 and had been in Yugoslavia at some time since that date should be 'based upon the criteria' stated therein. The decision stated that 'various sources, including the personal observations of officers of this Service' in Yugoslavia had established that 'The Government of Yugoslavia is completely under the domination and control of the Communist Party of Yugoslavia'; that 'Advancement in almost any line of activity is, with few exceptions, limited to Party members'; that 'The basic freedom to criticize, as we know and enjoy it, does not exist in Yugoslavia'; that 'On the other hand, churches throughout the country are open for public worship and religious assembly and they are being maintained and repaired, obviously with Government permission, if not with its approval or support'; and that Yugoslavia had granted asylum to thousands of anti-Communist Hungarians. * * * Possible punishment for desertion 'is not the physical persecution contemplated by the statute. Physical persecution con-

templates incarceration or subjection to corporal punishment, torture, or death based usually on one's race, religion or political opinions.' As to Kale's other fears, 'Economic sanctions applied against those not members of the controlling clique in a country whose economic system is completely and rigidly state-controlled is not physical persecution.' "

Diminich v. Esperdy, 299 F.2d 244, 246–247 (2d Cir. 1961), cert. denied, 369 U.S. 844, 82 S.Ct. 875, 7 L.Ed.2d 848 (1962).

Following the issuance of the Kale decision,[6] appellants' applications for relief under Section 243(h) came on for hearings before special inquiry officers. After full hearings, appellants' applications were denied.[7] Filing of the amended complaint in this action followed.

██ We find it unnecessary to repeat here the exhaustive exposition of the evidence contained in Judge Bryan's careful opinion dismissing the complaint. 209 F.Supp. 673. Suffice it to say that we completely agree with Judge Bryan's conclusion that appellants "wholly failed to adduce any proof which supports their claim" that their applications were prejudged pursuant to an unlawful policy to exclude crewmen from relief under Section 243(h). 209 F.Supp. at 678. It is true that along with the other evidence presented at the administrative hearings, appellants' status as former crewmen was considered by the inquiry officers in passing upon appellants' applications. But this was entirely proper, since an applicant's former position in Yugoslavia, and his manner of entry into this country are clearly relevant to a determination of the likelihood of his "physical persecution" if deported back to Yugoslavia.

The use of the Kale decision as a guide for handling the similar cases of appellants was not improper. We agree entirely with Judge Dimock's conclusion, adopted as well by Judge Bryan, that

"[T]he Kale decision was issued as a precedent on the meaning of persecution in cases of Yugoslav nationals, just as a decision of the Supreme Court is designed to have general application in cases involving similar facts before lower federal courts. The additional evidence supplied by plaintiffs fails to create any inference that the Kale decision was either calculated to, or did in fact, elicit slavish adherence to a policy of denying all stays of deportation to Yugoslav crewmen."

195 F.Supp. at 493.

Appellants advanced no grounds here or in the district courts for separate or special treatment of the position of the one appellant who is a Latvian. We assume that the same considerations apply to him and we hold that there is likewise no evidence of the existence of an unlawful policy in his case.

Affirmed.

The question of whether these appellants would, in fact, be subjected to physical persecution if deported to Yugoslavia or Latvia is not before us on this appeal. Compare Zupicich v. Esperdy, 319 F.2d 773 (2d Cir. 1963); Sovich v. Esperdy, 319 F.2d 21 (2d Cir. 1963); Diminich v. Esperdy, 299 F.2d 244 (2d Cir. 1961), cert. denied, 369 U.S. 844, 82 S.Ct. 875, 7 L.Ed.2d 848 (1962).

6. The full text of the relevant portions of the Kale decision is set forth in Judge Dimock's second opinion. 195 F.Supp. 488 at 491–492.

7. In the case of appellant Stroligo, the application was denied by the Regional Commissioner after the inquiry officer had recommended that it be granted. In all other cases the inquiry officers recommended denial.