o

MATTER OF SHIRINIAN

Application for Classification as Refugee

A-14343990

*Decided by Regional Commissioner March 10, 1967*

Classification as a refugee under the proviso to section 203(a)(7) of the Immigration and Nationality Act, as amended, is denied a native of Turkey (an Armenian) and citizen of the United Arab Republic for failure to establish that she fled from, and is unable or unwilling to return to, the United Arab Republic because of persecution or fear of persecution on account of race, religion or political opinion where her passport had been revalidated twice by United Arab Republic authorities after she left that country, and other indications exist that her family had not been persecuted in that country.

IN BEHALF OF APPLICANT: Harry A. Ezratty, Esquire
299 Broadway
New York, New York 10007

This matter is before the Regional Commissioner on certification of the decision of the District Director denying the applications.

The applicant is a 66-year-old native of Turkey and citizen of the United Arab Republic. She is of the Armenian race and is a member of the Armenian Orthodox Church. She last entered the United States on October 23, 1963 as a visitor for pleasure until January 30, 1964. On January 20, 1964 she was granted an extension of stay to May 30, 1964 on her application showing the reason for the request as to visit the New York World's Fair. She applied May 13, 1964 for a further extension, "waiting for arrival of relatives, visit Fair together and return together", and her stay was then extended to November 30, 1964. Three further extensions of stay were granted, the last to January 1, 1966. These applications showed that her husband, Diran Chirinian, resided in Cairo. The instant applications for refugee classification and adjustment of status to permanent residence were filed January 17, 1966.

The applicant had the two-years continuous physical presence in the United States specified in the proviso to section 203(a)(7) of the

amended Act. Further pertinent requirements of the subsection are that applicants thereunder satisfy this Service that:

(i) because of *persecution* or *fear of persecution on account of race, religion, or political opinion they have fled* (I) from any Communist or Communist-dominated country or area, or (II) from any country within the general area of the Middle East, and (ii) *are unable or unwilling to return to such country or area on account of race, religion, or political opinion.* . . . (Emphasis supplied.)

The United Arab Republic, the country of the applicant's last permanent foreign residence, is a country within the "general area of the Middle East" as that term is defined in section 203(a)(7). On the application for refugee classification, Form I-590A, the applicant states she fled from:

Cairo, Egypt, on the 16th of August, 1960. The persecutions against the Christians and the Jews were unbearable, and there was no future for the young generation. I decided to take my daughter out of that "Socialist" country, as soon as possible. She left as a student and left with her so as to see her settled as she was under-age yet. I cannot return, because I was supposed to return after six months the maximum. Naturally I didn't, and if I go back I shall be imprisoned. My husband is kept there as a kind of a hostage and the authorities do not let him get out of the country. Moreover, my passport expired last month, and accordingly I am stateless.

The record shows the applicant and her daughter, Mayda (now a permanent resident of the United States by adjustment of status on October 24, 1966 after acquiring immediate relative classification through marriage to a citizen of the United States on October 11, 1966), left Egypt on August 16, 1960; that they proceeded through the United States to Canada where the daughter studied for her Master's degree and where they lived until required to depart by the Canadian Immigration Service in November 1962; that they then again passed through the United States in transit to Switzerland where they lived about one year in a temporary status; and that they returned to the United States as visitors on October 23, 1963, as related above.

The applicant was interviewed by an officer of this Service on June 8, 1966. She then stated that she and her daughter could not return to the United Arab Republic because she was given a visa allowing her to remain out of that country not more than six months and her daughter not more than one year; that her husband is a hostage in that country and is not allowed to leave; and that she does not want to return to the United Arab Republic for these reasons.

Submitted with the application was a statement signed by the daughter. The daughter stated the applicant cannot return to Egypt because (1) she requires the constant care only the daughter can give her, (2) the applicant could not remain outside Egypt more than six

393

months and would be imprisoned if she returned to Egypt, and (3) that the applicant has never been separated from the daughter upon whom she is dependent in every way. The daughter asserts her father has had a miserable life since 1960, but states:

My Father, who has an artistic engraving workshop in Cairo, was and is a very respected man and he does all the fine as well as the top-secret works of the Government, the Army, the United Nations and other foreign Embassies and dignitaries. . . .

A friend of the family who has been residing in Switzerland since shortly after the "Aggression of 1956" states that following the Tripartite Aggression against Egypt, the unemployment of white people in that country increased as well as the injustices; and that he is positive that should the applicant return to the U.A.R. she would be imprisoned because "according to the Egyptians, anybody who stays out of U.A.R. for over the limited time that is granted, and goes back, he or she is guilty and must be punished".

Examination of the applicant's passport shows it was issued by the United Arab Republic at Cairo on May 24, 1960; that it was originally valid to May 23, 1962; that it was endorsed August 7, 1960 by the Bank of Alexandria, Cairo, for the release of funds; that it was revalidated by the Consul General for the U.A.R. at Montreal on February 26, 1962 until May 23, 1964; and that it was again revalidated by the Consul General of the U.A.R. at New York on February 1, 1964 until May 23, 1966. The name of the husband is shown on page 1 of the passport.

Counsel has presented for our consideration on certification copies of articles from the New York Times of January 11 and 16, 1957 and February 6 and 19, 1957. He directs attention to the article of February 19, 1957 which shows that *aliens* were departing from Egypt in large numbers. This article stated that there was a mass departure of stateless Jews; and that Italians, Greeks, and Eastern Europeans were also leaving because they felt that the outlook for business in the consumer field, plus the new "Egyptianization" laws, gave little hope for making a living. The other articles related primarily to the transfer of foreign-owned financial institutions to Egyptian control and to the treatment of Jews in Egypt. These articles have little if any relevance and are remote in point of time.

We have carefully reviewed the entire record. The primary reason advanced for the applicant's inability or unwillingness to return to the United Arab Republic is that by reason of having remained outside that country for a longer time than authorized, she will be subject to imprisonment for a violation of a law of that country. Such imprisonment may not be considered on account of race, religion, or

394

political opinion, but rather is a criminal sanction that is reconcilable with generally recognized concepts of justice. Cf. *Matter of Bufalino*, I.D. #1517; *Zupicich* v. *Esperdy*, 319 F.2d 773 (2d Cir. 1963); *Diminich* v. *Esperdy*, 299 F.2d 244 (2d Cir. 1961); and *Blazina* v. *Bouchard*, 286 F.2d 507 (3rd Cir. 1961), certiorari denied 366 U.S. 950.

No evidence has been presented that the applicant was ever threatened with or suffered any persecution in Egypt. The daughter, while residing there, had obtained an education which qualified her for acceptance for graduate study in a Canadian university. The various applications for extensions of temporary stay of our applicant show bank accounts and funds adequate for her support for an extended period after departure from the United Arab Republic. Clearly inconsistent with any claim of unwillingness or inability to return to the United Arab Republic because of race, religion, or political opinion, or of departure from that country because of persecution or fear of persecution are the repeated presentations of the applicant's passport to Consular officials thereof for revalidation, particularly since that document identifies her husband in that country. They were married in the Armenian Church on September 7, 1921, and it is indicated he is of the same race and religion. He has lived in Egypt since 1914, and has been allowed to continue his business in Cairo, even to the extent of performing secret work for the government. The applicant wishes to remain in the United States with her daughter. We conclude that she has failed to establish satisfactorily that she is unwilling or unable to return to the United Arab Republic *on account of race, religion, or political opinion.* In addition, we find that the evidence does not establish that the applicant *fled* from the United Arab Republic because of persecution or fear of persecution on account of race, religion, or political opinion. She is therefore ineligible for refugee classification under the proviso to section 203(a)(7) of the Immigration and Nationality Act, as amended.

A statutory requirement for adjustment of status under section 245 of the Immigration and Nationality Act, as amended, is that an immigrant visa be immediately available to the applicant. Our applicant does not come within any of the preference categories of section 203(a) of the Act. The nonpreference category for Turkey, the quota area to which she is chargeable, is unavailable according to a current report from the Department of State. The application for adjustment of status must be denied on this statutory ground.

*It is ordered* that the decision of the District Director denying these applications be and hereby is affirmed.