# The President's Authority to Force the Shah to Return to Iran

The Shah cannot be extradited to Iran, since the United States has no extradition treaty with Iran; however, §§ 241(a)(7) and 212(a)(27) of the Immigration and Nationality Act (INA) would permit the Attorney General to deport the Shah if his presence in this country were determined to be prejudicial to the public interest.

On its face, § 243(a) of the INA appears to permit the Attorney General to force the Shah, upon deportation, to return to Iran; however, § 243(h) of the INA and applicable principles of international law would preclude the Attorney General's forcing anyone to return to a country where he or she would be subject to political persecution, as the Shah would be if deported to Iran.

November 23, 1979

## MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

Among the questions that have arisen in informal conversations during recent days is the issue whether the President has the authority to repatriate the deposed Shah of Iran. Under the decided cases there is doubt about the President's legal authority to compel the Shah to return to Iran.

The Shah cannot be extradited to Iran. The President cannot order any person extradited unless a treaty or statute authorizes him to do so. "[T]he power to provide for extradition . . . is not confided to the Executive in the absence of treaty or legislative provision." *Valentine* v. *United States ex rel. Neidecker,* 299 U.S. 5, 8 (1936).[1] The United States has no extradition treaty with Iran, *see* 18 U.S.C. § 3181 note, and the applicable statute authorizes extradition only when "there is a treaty or convention for extradition between the United States and [a] foreign government." 18 U.S.C. § 3184.[2]

---

[1] *Valentine* involved an effort to extradite *American citizens* to a foreign country, but for several reasons the case should be read to limit efforts to extradite any person. First, the language and reasoning of the case are almost uniformly broad enough to apply to all extraditions. Second, so far as we are aware, no lower court has ever read *Valentine* to hold that the President has greater power to extradite aliens than he does to extradite citizens. *See, e.g., Argento* v. *Horn,* 241 F.2d 258, 259 (6th Cir. 1957). Third, the *Valentine* Court rested its holding on "the fundamental consideration that the Constitution creates no executive prerogative to dispose of the liberty of the individual. Proceedings against him must be authorized by law." *Id.* at 9. It is now clear, although it may not have been at the time of *Valentine,* that aliens as well as citizens are deprived of their "individual liberty"—at least for purposes of the Due Process Clause—when they are forced to leave the United States. *See, e.g., Wong Yang Sung* v. *McGrath,* 339 U.S. 33, 49–50 (1950).

[2] Even if *Valentine* permits the President to extradite an alien without affirmative authority from a treaty or statute, *see* note 1 *supra,* this statute, by authorizing extradition only to nations with whom the United States has a treaty, arguably denies the President the power to extradite in all other cases.

149

The President can have the Shah deported and forced to return to Iran. Section 241(a)(7) of the Immigration and Nationality Act, referring to § 212(a)(27), provides that "[a]ny alien in the United States . . . shall, upon the order of the Attorney General, be deported who . . . is engaged . . . in any . . . activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States." 8 U.S.C. §§ 1251(a)(7), 1182(a)(27). It is unclear whether the Shah's merely being in the United States, and accepting medical care, amounts to an "activity" within §§ 241(a)(7) and 212(a)(27). Although the issue is not free from doubt, we believe that the better view, adopted by previous opinions of this Office, is that presence alone can constitute an "activity" under these sections. By causing the lives of American hostages to be threatened, the Shah's presence probably is "prejudicial to the public interest" if indeed it does not "endanger the welfare [or] safety . . . of the United States." In addition, this Office has previously expressed the view that serious harm to the Nation's conduct of foreign affairs constitutes prejudice to the public interest within the meaning of these provisions.[3] Thus §§ 241(a)(7) and 212(a)(27) permit the Attorney General to deport the Shah.

If the Shah is deported, § 243(a) of the Act, 8 U.S.C. § 1253(a), appears on its face to empower the Attorney General to force him to return to Iran. Section 243(a) provides that a deported alien is to be sent to a country he designates, "unless the Attorney General, in his discretion, concludes that deportation to such country would be prejudicial to the interests of the United States." If the Attorney General believed that allowing the Shah to leave the United States for a nation other than Iran would endanger the lives of American hostages or harm American foreign policy, he could exercise his discretion to reject the Shah's designation.[4] If an alien's designation is not observed, "deportation of such alien shall be directed to any country of which such alien is a subject, national, or citizen if such country is willing to accept him into its territory." § 243(a), 8 U.S.C. § 1253(a).[5]

Section 243(h) of the Immigration and Nationality Act, however, provides that

> The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to

---

[3] Specifically, in 1977 this Office concluded that the Attorney General had the power to exclude trade representatives of the illegal Rhodesian government on the grounds that their activities would adversely affect American foreign policy interests and that even allowing them to enter the country would violate our obligations under a Security Council Resolution.

[4] See our interpretation of parallel language—"prejudicial to the public interest"—in §§ 241(a)(7) and 212(a)(27), which authorize deportation.

[5] If the Shah has been stripped of his Iranian citizenship, and is no longer an Iranian national, § 243(a) still gives the Attorney General ample authority to deport him to Iran. See, e.g., § 243(a)(3), (7), 8 U.S.C. § 1253(a)(3), (7).

150

persecution on account of race, religion, or political opinion . . . .

8 U.S.C. § 1253(h). Courts have consistently followed the unvarying practice of the Attorney General, *see Matter of Dunar*, 14 I.&N. Dec. 310, 322 n.20 (1973), and interpreted § 243(h) not just to authorize but to *require* the Attorney General not to deport an alien to a country where he is likely to be persecuted. *See, e.g., Kovac* v. *INS*, 407 F.2d 102, 104 (9th Cir. 1969); *U.S. ex rel. Dolenz* v. *Shaughnessy*, 206 F.2d 392, 395 (2d Cir. 1953); 1 Gordon & Rosenfield, Immigration Law and Procedure 5-178, 5-179 (1979). The Multilateral Protocol Relating to the Status of Refugees, which binds the United States, confirms this interpretation. It provides:

> No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.[6]

"Refugee" is defined, in part, as:

> any person who . . . owing to a well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality. . . .[7]

Thus the Protocol allows the Attorney General no discretion[8] to deport a refugee to a territory "where his life or freedom would be threatened" by political persecution.[9]

The only remaining issue, under both the Protocol and § 243(h), is whether the Shah would be "persecuted" on account of "political opinion" if he were returned to Iran. In other cases courts have generally deferred to the conclusion of the Immigration and Naturalization Service (INS)—the Attorney General's delegate—on this issue, but that

---

[6]Article 33, United Nations Convention Relating to the Status of Refugees, 185 U.N.T.S. 150, 176 (1954), incorporated in the Protocol, 19 U.S.T. 6223, T.I.A.S. No. 6577 (1968).

[7]Article 1 of United Nations Convention, *supra* note 6.

[8]The Protocol does specify that "[t]he benefit of [this protection] may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is . . ." Article 33 of the U.N. Convention, *supra* note 6. It is unlikely that "danger to the security" of the asylum country should be interpreted to include threats made, in an effort to obtain the refugee, by the country which wants to persecute him; such an interpretation would in effect allow the very nation from which the refugee needs protection to nullify that protection. This point is not entirely clear, however, and a colorable argument can be made from the language itself that the Protocol would authorize the President to return the Shah. This issue should be reviewed with those at the State Department who have had experience with matters of this sort.

[9]The legislative history of the ratification of the Protocol suggests that the Senate understood Article 33 to make little change in prevailing law under § 243(h), but this understanding was based on the consistent interpretation of § 243(h) as requiring, and not just authorizing, the Attorney General to withhold the deportation of likely victims of persecution. *See Matter of Dunar*, 14 I. & N. Dec. 310 (1973). On this basis, the courts and the Immigration and Naturalization Service have held that the requirements of § 243(h) are substantially the same as those of Article 33. *See id.* at 322-23; *Kashani* v. *INS*, 547 F.2d 376, 379 (7th Cir. 1977).

has been because the only dispute was factual; the alien asserted, and the INS denied, that the alien would be harmed or punished by the country to which the INS proposed to deport him.

The facts about the reception the Shah would receive in Iran are fairly clear, however, so in this case the issue would become basically one of law—whether "persecution on account of . . . political opinion" correctly characterizes the actions the Iranian government has promised to take. In dealing with this question of law courts have interpreted the language themselves and have been reluctant to defer to the INS's interpretations. *See, e.g., Kovac* v. *INS,* 407 F.2d 102, 104–07 (9th Cir. 1969); *Sovich* v. *Esperdy,* 319 F.2d 21, 25–29 (2d Cir. 1963). And under the standards that have developed, what the Iranian government proposes to do would almost certainly qualify as persecution on account of political opinion. Courts have found, for example, that a threatened prosecution constituted persecution when it was politically motivated and when the procedures would be irregular or capricious. *See, e.g., Coriolan* v. *INS,* 559 F.2d 993, 1000–04 (5th Cir. 1977) (Tuttle, J.; Coleman, J., dissenting). In general, if an alien can establish that he is likely to be punished upon his return, courts have allowed him to be deported only if the punishment is for an "ordinary crime" of the sort that might be punished under any regime and that has no overtly political import. *See, e.g., MacCaud* v. *INS,* 500 F.2d 355, 359 (2d Cir. 1974); *Kalatjis* v. *Rosenberg,* 305 F.2d 249, 252 (9th Cir. 1962). If a policy decision were made to press for the Shah's deportation to Iran, it could be argued that Iran wants to punish the Shah not for his opinions but for his actions. But apparently those same actions, if taken to promote a different political view or cause, would not now be a crime in Iran; this is probably sufficient to make the Shah's prospective punishment "persecution on account of . . . political opinion." *See, e.g., Coriolan* v. *INS, supra; Ross* v. *INS,* 440 F.2d 100, 101 (1st Cir. 1971). For these reasons, on the facts available at this time, we believe that the Attorney General lacks the authority to require the Shah to return to Iran.

LARRY A. HAMMOND
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
